***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dollar and the briefs and arguments of the parties. Both sides have shown good ground to reconsider the evidence. Therefore, the Full Commission enters the following Opinion and Award:
 ***********
Commissioner Christopher Scott, who originally sat on the panel that heard the oral arguments in this case, recused himself after oral arguments from consideration of this matter.
 *********** EVIDENTIARY RULINGS
Plaintiff filed a Motion to Supplement the Record on Appeal. Defendant responded that they had no objection to this motion. Therefore, plaintiffs' Motion to Supplement the Record on Appeal is GRANTED and the evidence that plaintiffs filed an election of remedies on 2 March 2001 under the federal statutory scheme is received into the evidentiary record of this matter.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in their Pre-Trial Agreement, filed on 9 August 2002, and at the hearing before the deputy commissioner as
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Childhood Vaccine-Related Injury Compensation Program, N.C. GEN. STAT. § 130A-422, et seq., at all relevant times.
2. Hayden L. Goetz was born on 14 May 1993, the first child of Andrew and Catherine Goetz, at Durham Regional Hospital, Durham, North Carolina.
3. On delivery, Hayden had Apgar scores of nine out of ten at one minute and nine out of ten at five minutes.
4. On 6 July 1993, at the age of two months, the Petitioners took Hayden to Durham Pediatrics in Durham, North Carolina for his check-up and DPT shot.
5. Hayden was administered a DPT vaccine manufactured by the Respondent's predecessor Lederle Labs, under the trade name "Tetramune", in lot number 352922.
6. On 31 August 1993, Petitioners returned to the pediatrician's office for Hayden's second DPT shot.
7. The second shot was manufactured by Respondent's predecessor Lederle Labs under the name "Tetramune", in lot number 352922.
8. Hayden received his third DPT shot on 19 November 1993 at the office of the pediatrician. Hayden was given Tylenol before the vaccination, per the doctor's suggestion.
9. This shot was manufactured by Respondent's predecessor Lederle Labs under the name "Tetramune", in lot number 388984.
10. Petitioners presented this claim to the Secretary of Health and Human Services pursuant to the Public Health Services Act in March of 1999. On 25 January 2001, the U.S. Court of Appeals for the Federal Circuit ordered the case dismissed as having been filed outside the statutory time limit of 42 U.S.C. § 300aa-16.
11. The parties stipulate that the damages sustained by Hayden Goetz in lost income, loss of future earnings, and pain and suffering, exceed the statutory amount of damages allowed ($300,000.00).
12. The issue for determination is whether plaintiff Hayden Goetz sustained a vaccine-related injury, and if so, to what amount of damages is he entitled under the Childhood Vaccine-Related Injury Compensation Program?
13. The parties stipulated the following into evidence:
 a. Prenatal, labor and delivery records for Catherine Goetz, pp. 1-15,
b. Medical Records of Hayden Goetz, pp. 16-541,
c. Letter of Dr. Jerry Wiley, pp. 542-543,
d. Letter of Dr. Kevin Ryan, p. 544,
e. Letter of Dr. Samuel Katz, p. 545,
f. Life Care Plan for Hayden Goetz, pp. 546-551,
g. C.V. of Dr. Jerry Wiley, pp. 552-557,
 h. Commonly Asked Questions about the National Vaccine Injury Compensation Program, pp. 558-568,
i. Affidavit of Dr. Douglas Clark,
j. Videotapes and Deposition transcripts for:
1) Dr. Samuel L. Katz,
2) Dr. Kurt Klinepeter,
3) Dr. Amy S. Holmes, and
4) Dr. Allan D. Lieberman.
k. Videotape of Hayden Goetz.
 ***********
Based upon all of the competent evidence the Full Commission makes the following
 FINDINGS OF FACT
1. Andrew and Catherine Goetz are the parents of Hayden L. Goetz, who was born on 14 May 1993. There were no significant complications during the pregnancy. Labor was induced due to concerns about decreased fetal movement and the development of placental calcification. However, Hayden was a full term baby at the time of caesarian delivery.
2. Apgar Scores are measured at one minute after birth and five minutes after birth. They are a measure of heart rate, color, tone, reflex irritability and respiratory rate. A child born mentally retarded or autistic could have normal Apgar Scores. On delivery, Hayden had Apgar scores of nine out of ten at one minute and nine out of ten at five minutes.
3. Hayden received various immunizations during his early months, including two doses of the Hepatitis B vaccine, four doses of the Diptheria/Pertussis/Tetanus (DPT) vaccine, the Measles/Mumps/Rubella vaccine and the polio vaccine. While the parents of Hayden maintain that Hayden suffered a reaction to the DPT vaccine, there was conflicting testimony as to whether Hayden suffered adverse reactions to the vaccines, and if so, the severity of the reactions.
4. Hayden received the first DPT injection at approximately 2:00 p.m. on 6 July 1993. Dr. Douglas Clark, of Durham Pediatrics, administered the shot. There are no notations in the records of Durham Pediatrics of any telephone consultations following this shot.
5. Hayden received the second DPT injection on 31 August 1993 administered by Durham Pediatrics. There are no notations in the records of Durham Pediatrics of any telephone consultations following the second shot.
6. The first notation made in Hayden's medical record after the second vaccine was given is 4 October 1993 when Hayden presented with fussiness, crying and a fever. This is more than a month after the second DPT injection was administered and there is no indication in the record that this visit had any connection to Hayden's vaccinations.
7. Prior to Labor Day of 1993, Hayden's paternal grandparents became concerned about Hayden's development. They expressed their concerns to Catherine and Andrew Goetz.
8. Hayden's parents also observed that he did not appear to be developing like other children his age. In addition, after about four months of age, Hayden began to develop ear infections.
9. Prior to the 19 November 1993 DPT injection, Hayden's parents contacted the pediatrician and were instructed to give him Tylenol before the appointment to minimize reaction to the shot, which they did. On 19 November 1993, Hayden received his third DPT injection, and the pediatrician suggested Hayden's parents also give their child Motrin following the shot. Upon returning home, Hayden developed a fever of 101 degrees.
10. From on or about 4 October 1993, pediatrician Dr. Douglas Clark noted Hayden began to develop multiple upper respiratory, ear, throat, and bronchi infections, as well as Coxsackie virus and chicken pox. By 16 February 1994, the pediatrician noted Hayden had some developmental delays; and by 16 September 1994, Hayden's development was noted as continuing to deviate from the norm.
11. Hayden has received evaluations from a variety of medical experts, in an attempt to diagnose his condition and recommend possible treatment.
12. Hayden's parents have given conflicting reports of Hayden's medical history to the medical experts who have attempted to diagnose and treat the child.
13. The records of Durham Pediatrics do not indicate any type of reaction to either the first or the second DPT shot. The records indicate that after the third shot, the child was fussy and had a fever for more than 24 hours. It is noted that the Durham Pediatrics practice was diligent in their medical notes, including detailing phone conversations.
14. On 26 May 1994, Dr. Michael Tennison of UNC Hospitals' Neurology Department and Clinical Center for the Study of Development and Learning / Child Development Institute evaluated Hayden's development. A brain MRI revealed a thin corpus callosum and peripheral decreased myelination. Following extensive testing and evaluation by an interdisciplinary team at the Clinical Center for the Study of Development and Learning, Hayden was diagnosed with developmental delay and a static encephalopathy with no known cause. During the course of the evaluations, Hayden's parents related the history of the vaccine reactions, which indicated no reaction to the first two shots. There is a note that the child screamed for more than 30 minutes following the third shot.
15. Dr. Allan J. Lieberman, an Occupational and Environmental Medicine specialist, examined the child once on 12 August 1997. His records, taken from a history given four years after the shots were administered, indicate that following the first shot, the child had a fever of 103-104. Following the second shot, the child had a fever of 104 plus a high-pitched scream. There is no mention of a reaction to the third shot.
16. During the course of the evaluation, Dr. Lieberman performed challenge testing, which indicated Hayden had an allergic reaction to the bacillus pertussis. Dr. Lieberman opined Hayden had post-immunization encephalopathy related to the DPT vaccine. Dr. Lieberman further opined the high-pitched cry is a sign of central nervous system injury. Dr. Lieberman bases his diagnosis on a temporal relationship between Hayden's vaccine and his arrested development.
17. Dr. Katz and Dr. Wiley criticized Dr. Lieberman's "challenge testing" method. Dr. Wiley testified that the "challenge testing" approach would only be valid if it were correlated with clinical findings. He further stated that a person who has received a pertussis vaccine should, in fact, test positive for pertussis antibodies. Dr. Katz stated that he was unaware of any documentation the "challenge testing" was a reliable or accepted procedure for diagnosing vaccine related injuries.
18. Dr. Kurt Klinepeter, an expert in neonatal research at Bowman Gray School of Medicine, examined Hayden on 24 March 1998. The records from the history given to Dr. Klinepeter by Hayden's parents indicate that the parents reported the child had a fever and was lethargic and crying following the first two DPT shots. Following the third DPT shot, the parents reported the child had a fever. Dr. Klinepeter opined that to a reasonable degree of medical certainty, he had no opinion as to the etiology of Hayden's condition; only that Hayden had a mental deficiency with particular weakness in expressive language skills.
19. Jerry Wiley, M.D., is a former pediatrician who now works as a medical consultant with the North Carolina Division of Public Health and has helped administer the Childhood Vaccine Injury Program since its inception. Dr. Wiley evaluated Hayden's case based on the child's medical records and concurred with Dr. Tennison's diagnosis of Hayden's condition as a static encephalopathy. He defined encephalopathy as a pathology of the brain, meaning that the brain is not functioning as it should. "Static" in this instance means the condition will not worsen or improve. He opined that Hayden is moderate to severely mentally retarded with a deficit in expressive language.
20. Dr. Wiley stated that there is nothing in the clinical record that gives an indication that Hayden developed encephalopathy as a result of the vaccine. According to the records, Hayden had a reaction to the vaccine in that he was irritable, had some fever, some redness and some tenderness at the injection site. Further, Dr. Wiley stated that a high-pitched scream alone does not constitute an encephalopathy. None of these symptoms are consistent with an encephalopathy resulting from the vaccine.
21. Dr. Wiley's opinion is that when a child has a fever of 105 degrees following a vaccination, such as Hayden's parents allege, another dose of the vaccine should not be given. The medical records do not reflect Hayden as having a temperature of 105 degrees following administration of the DPT vaccines. He indicated further than in his experience a two-month old child with a fever of 102 degrees or greater, such as Hayden's parents allege, needs to be seen by the pediatrician, regardless of whether a vaccine has been given or not, just to rule out any possible infection.
22. Samuel L. Katz, M.D. evaluated Hayden's case based on a case report from the Immunization Branch of the Department of Health and Human Services. Dr. Katz is a trained pediatrician with 45 years of experience working with vaccines in clinical and investigative studies. He was a member of the Vaccine Injury Compensation Commission and assisted in developing this program.
23. Dr. Katz testified there was no indication that Hayden had an encephalopathy. He noted the inconsistencies throughout the history. He stated that the reported fever of 106 degrees, as alleged, following the first shot and high pitched scream following the second shot were the only two remarkable events in the history. However, neither of these events were accompanied by the symptoms of encephalopathy. According to Dr. Katz an encephalopathy would be diagnosed by a child becoming unconscious, becoming unresponsive, possibly having seizures, possibly suffering from increased spinal fluid pressure or possibly suffering from some type of paralysis. An encephalopathy should appear within 72 hours of the child receiving the vaccine, which would indicate the encephalopathy is a result of the vaccine. Dr. Katz stated that Hayden had no symptoms of encephalopathy at the time following the administration of the vaccines.
24. Dr. Katz stated vaccinations are generally given at 2 months, 4 months, 6 months and 12 months. These are also the times when signs of developmental disorders begin appearing. He stated that there may be a temporal relation, but that does not translate to a causal relation. Therefore, it is Dr. Katz' opinion that Hayden's developmental disorder is not causally related to the DTP vaccines.
25. Dr. Katz' diagnosis of Hayden is a global developmental delay, which is a condition which has no known cause in the majority of the cases so diagnosed.
26. Amy S. Holmes, M.D., an oncologist who now operates a practice specializing in autistic children, evaluated Hayden on 4 October 2000. In the history given to Dr. Holmes by Hayden's parents, they reported that Hayden had a fever of 105 degrees following the first shot and a fever of 105 degrees after the second shot, which was accompanied by high-pitched screaming. It is her opinion that Thimerasol, a preservative derived from ethyl mercury and used in vaccines, causes autism. It is her opinion based on the history given to her by Hayden's parents that Hayden suffers from an autistic spectrum disorder that resulted from mercury toxicity from the childhood vaccines.
27. Dr. Katz disagreed with Dr. Holmes diagnosis because Hayden is described as being able to develop relationships, whereas an autistic child has problems making any kind of contact or interact with other people. Neither Dr. Klinepeter nor Dr. Lieberman diagnosed Hayden as autistic. Dr. Lieberman stated that Hayden does not show the symptoms of an autistic child, rather his symptoms are that of mental retardation. Therefore, little weight is given to the testimony of Dr. Holmes.
28. In evaluating the medical evidence, greater weight is given to the causation opinions of Dr. Katz, Dr. Wiley, Dr. Tennison and Dr. Klinepeter who concur that Hayden's developmental disorder is not related to the pertussis vaccine than to the opinions of Dr. Lieberman and Dr. Holmes.
29. Plaintiffs have failed to prove that Hayden Goetz suffered a vaccine-related injury.
30. In March 1999, plaintiffs filed a claim under 42 U.S.C. § 300aa, the Federal Vaccine Related Injury Compensation Program. On January 25, 2001, the U.S. Court of Appeals for the Federal Circuit ordered the case dismissed, as having been filed outside the statutory time of42 U.S.C. § 300aa-16, which is a period of three years from the date of the vaccinations. As Hayden received his vaccinations in 1993, even using the dates of his second or third shot, plaintiffs' claim would have been outside the federal statutory period for filing a claim. However, the North Carolina Childhood Vaccine Injury Compensation statute allows claims to be filed six years from the date of the administration of the vaccine alleged to have caused the injury. It also requires that plaintiffs first seek federal relief before pursuing relief under the North Carolina Childhood Vaccine Injury Compensation Program.
31. During the time plaintiffs' petition was pending before Federal Court, the tolling provisions of the North Carolina Childhood Vaccine Related Injury Compensation Program were in effect. Once the Federal Circuit ordered the case dismissed on January 25, 2001, plaintiffs were allowed by statute an additional 120 days to file under the North Carolina Childhood Vaccine Related Injury Compensation Program.
32. On 2 March 2001, plaintiffs filed their Election to File a Civil Action pursuant to 42 U.S.C. § 300aa 21(a) in the United States Court of Federal Claims which satisfies the statutory requirements of the North Carolina Childhood Vaccine Related Injury Compensation Statute.
33. Plaintiffs prepared an I.C. Form V-1, Claim for Damages Under Childhood Vaccine-Related Injury Compensation Program on or about 26 February 2001 and filed the same with the North Carolina Industrial Commission on 2 March 2001 which was within the 120 days allowed by the North Carolina Childhood Vaccine Related Injury Compensation Statute.
 ***********
The foregoing findings of fact engender the following
 CONCLUSION OF LAW
1. Pursuant to N.C. Gen. Stat. § 130A-429(a), any claim under the Vaccine-Related Injury statute that is filed more than six years after the administration of a vaccine alleged to have caused a vaccine-related injury is barred. However, this state statute of limitations is tolled during the pendency of a claim filed pursuant to the federal statutory scheme. N.C. Gen. Stat. § 130A-429. Herein, plaintiff filed their claim within 120 days of the judgment by federal court, therefore, this claim is within the tolling provision of the state statute of limitations.
2. On 2 March 2001 plaintiffs filed their Election to File a Civil Action pursuant to 42 U.S.C. § 300aa 21(a) in the United States Court of Federal Claims which satisfies the requirements of N.C. Gen. Stat. § 130A-425(b).
3. The parties are properly before this Commission and the Commission has jurisdiction to decide this case under the Vaccine Injury Compensation Act. N.C. Gen. Stat. § 130A-422.
4. In order to recover benefits under the Vaccine Injury Compensation Act, plaintiffs must prove a causal relation between the vaccine and the injury. In a case where the threshold question is the cause of a controversial medical condition, the maxim of "post hoc, ergo propter hoc," (after that, therefore because of that) is not competent evidence of causation. Johnson v. Western Union Tel. Co., 177 N.C. 31, 97 S.E. 757, N.C. (1919), Ingold v. Carolina Power Light Co., 11 N.C. App. 253,181 S.E.2d 173 (1971), Young v. Hickory Business Furniture, 300 N.C. 277,538 S.E.2d 912 (2000). In the instant case, the only testimony linking the developmental disorder of Hayden Goetz to a vaccine is that of Dr. Lieberman and Dr. Holmes. Dr. Lieberman makes this link through a temporal chain, which under the law is not sufficient. The testimony of Dr. Lieberman, in general, and Dr. Holmes, regarding the diagnosis of autism which is herein rejected, is insufficient to meet the degree of medical certainty and competency standard necessary to establish a causal link between the developmental disorder of Hayden Goetz and a vaccine injury. Holley v. ACTS INC, 357 N.C. 228, 581 S.E.2d 750 (2003).
5. Dr. Katz, Dr. Wiley, Dr. Tennison and Dr. Klinepeter concur and the Full Commission so concludes that the injuries alleged in this claim are not vaccine-related. N.C. Gen. Stat. § 130A-426.
 ***********
Based upon the foregoing findings of fact and conclusion of law, the Full Commission enters the following
 ORDER
1. Plaintiff's claim for damages under the Childhood Vaccine-Related Injury Compensation Program is, and the same must be, DENIED.
2. Each side shall pay its own costs.
This the 25th day of November 2003.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN